## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK KELLY, United States Senator
representing the State of Arizona,

*Plaintiff*,

v.

PETE HEGSETH, in his official capacity as
Secretary of Defense, *et al.*,

*Defendants*.

Case No. 26-cv-81

Oral Argument Requested
Expedited Hearing Requested

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY UNDER 5 U.S.C. § 705

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

STATEMENT OF FACTS .........................................................................................................4

    A.   Senator Kelly's Military and Congressional Service...........................................................4

    B.   The Administration's Military Actions and Senator Kelly's Statements ...........................5

    C.   Defendants' Response and Punitive Actions Against Senator Kelly Based on Public
Statements ...................................................................................................................6

LEGAL STANDARD ...............................................................................................................10

ARGUMENT ............................................................................................................................10

I.     Senator Kelly Is Likely to Succeed on the Merits ............................................................10

    A.   Defendants' Actions Violate the First Amendment.........................................................11

    B.   Defendants' Actions Violate the Speech or Debate Clause.............................................18

    C.   Defendants' Actions Violate the Separation of Powers ...................................................23

    D.   Defendants' Actions Violate Due Process.......................................................................26

    E.   Defendants' Reopening Exceeds Their Statutory Authority ...........................................28

    F.   Defendants' Actions Are Subject to Immediate Judicial Review ....................................32

II.    Senator Kelly Will Suffer Irreparable Harm Absent Injunctive Relief ................................41

III.   The Balance of Equities and Public Interest Weigh Heavily in Senator Kelly's Favor ........43

CONCLUSION.........................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ....................................................................10

*Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ......................................................................................26

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024) ...................................................................42

*Am. Bar Ass'n v. DOJ*,
  783 F. Supp. 3d 236 (D.D.C. 2025) ...............................................................42

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) .....................................................................32

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) .......................................................................16

*Armour & Co. v. Freeman*,
  304 F.2d 404 (D.C. Cir. 1962) .......................................................................42

*\*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ..................................................................37, 38, 39, 42

*Beacon Assocs., Inc. v. Apprio, Inc.*,
  308 F. Supp. 3d 277 (D.D.C. 2018) ...............................................................43

*\*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................32, 34

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ......................................................................................30

*Bogan v. Scott-Harris*,
  523 U.S. 44 (1998) ........................................................................................20

*\*Bond v. Floyd*,
  385 U.S. 116 (1966) ...............................................................................passim

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ......................................................................................14

*Buckley v. Valeo,
   424 U.S. 1 (1976)..................................................................................22, 24, 25

Bufalino v. Kennedy,
   322 F.2d 1016 (D.C. Cir. 1963).........................................................................26

Cheney v. U.S. Dist. Ct. for D.C.,
   542 U.S. 367 (2004)..........................................................................................24

Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v.
   District of Columbia
   751 F. Supp. 218 (D.D.C. 1990).......................................................................41

*Cinderella Career & Finishing Schs. Inc. v. FTC,
   425 F.2d 583 (D.C. Cir. 1970)....................................................................26, 27

City of Rochester v. Bond,
   603 F.2d 927 (D.C. Cir. 1979).........................................................................36

Clinton v. City of New York,
   524 U.S. 417 (1998)..........................................................................................23

Code v. McCarthy,
   959 F.3d 406 (D.C. Cir. 2020).........................................................................36

Cox Broad. Corp. v. Cohn,
   420 U.S. 469 (1975)..........................................................................................35

Crowell v. Benson,
   285 U.S. 22 (1932)............................................................................................30

Cuomo v. U.S. Nuclear Regul. Comm'n,
   772 F.2d 972 (D.C. Cir. 1985).........................................................................10

Darby v. Cisneros,
   509 U.S. 137 (1993)..........................................................................................35

District of Columbia v. U.S. Dep't of Agric.,
   444 F. Supp. 3d 1 (D.D.C. 2020).....................................................................10

Doe v. McMillan,
   412 U.S. 306 (1973)....................................................................................19, 22

*Eastland v. U.S. Servicemen's Fund,
   421 U.S. 491 (1975)....................................................................................19, 21

Elrod v. Burns,
   427 U.S. 347 (1976)..........................................................................................41

*Ex parte Milligan*,
   71 U.S. 2 (1866) .......................................................................................................25

*Farrell v. Blinken*,
   4 F.4th 124 (D.C. Cir. 2021) ..................................................................................29

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
   769 F.3d 1127 (D.C. Cir. 2014) ..............................................................................27

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..........................................................................................30, 31

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   537 F.3d 667 (D.C. Cir. 2008) ................................................................................23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .................................................................................................38

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ...................................................................................................12

*Gravel v. United States*,
   408 U.S. 606 (1972) ...........................................................................18, 19, 20, 24

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ....................................................................................10

*Hall v. Johnson*,
   599 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................................9

*Hess v. Indiana*,
   414 U.S. 105 (1973) .................................................................................................15

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .....................................................................................................39

*Houghton v. Shafer*,
   392 U.S. 639 (1968) .................................................................................................36

*Houston Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022) ...........................................................................................16, 17

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) .....................................................................................20, 22, 38

*In re Sealed Case*,
   80 F.4th 355 (D.C. Cir. 2023) ...........................................................................20, 42

*Jackson v. Mabus*,
808 F.3d 933 (D.C. Cir. 2015) ................................................................36

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) ..................................................16, 18

*Jewish War Veterans of U.S., Inc. v. Gates*,
522 F. Supp. 2d 73 (D.D.C. 2007) ..........................................................42

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ................................................................41

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) ................................................................................31

*Kreis v. Sec'y of Air Force*,
866 F.2d 1508 (D.C. Cir. 1989) ..............................................................36

*Larrabee v. Del Toro*,
45 F.4th 81 (D.C. Cir. 2022) ..................................................................31

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................................................................43

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018) ..................................................................................11

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ................................................................................41

*Maracich v. Spears*,
570 U.S. 48 (2013) ..................................................................................29

*Maryland v. King*,
567 U.S. 1301 (2012) ..............................................................................42

*McCarthy v. Madigan*,
503 U.S. 140 (1992) ..........................................................................35, 36

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ........................................................41, 44

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ................................................................................34

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ..............................................................41

*Mistretta v. United States*,
 488 U.S. 361 (1989)...........................................................................................23

*Mitchell v. Forsyth*,
 472 U.S. 511 (1985)...........................................................................................38

*N.Y. Times Co. v. Sullivan*,
 376 U.S. 254 (1964).....................................................................................11, 12

*NAACP v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982)...........................................................................................15

*Nat'l Rifle Ass'n v. Vullo*,
 602 U.S. 175 (2024)...........................................................................................11

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
 434 U.S. 1345 (1977).........................................................................................42

*Nieves v. Bartlett*,
 587 U.S. 391 (2019)...........................................................................................16

*Nixon v. Fitzgerald*,
 457 U.S. 731 (1982)...........................................................................................25

*Nken v. Holder*,
 556 U.S. 418 (2009)...........................................................................................10

*NLRB v. Noel Canning*,
 573 U.S. 513 (2014)...........................................................................................25

*Parker v. Levy*,
 417 U.S. 733 (1974)...........................................................................................15

*Pursuing Am.'s Greatness v. FEC*,
 831 F.3d 500 (D.C. Cir. 2016)...........................................................................43

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015)...........................................................................................13

*Rhea Lana, Inc. v. Dep't of Lab.*,
 824 F.3d 1023 (D.C. Cir. 2016).........................................................................33

*Roelofs v. Sec'y of Air Force*,
 628 F.2d 594 (D.C. Cir. 1980)...........................................................................36

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995)...........................................................................................13

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) ........................................................................................ 17

*Sackett v. EPA*,
  566 U.S. 120 (2012) ................................................................................ 33, 34

*Safari Club Int'l v. Jewell*,
  842 F.3d 1280 (D.C. Cir. 2016) .................................................................. 32

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ................................................................................ 25, 38

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) .................................................................. 43

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .................................................................... 10

*Simms v. District of Columbia*,
  872 F. Supp. 2d 90 (D.D.C. 2012) .............................................................. 41

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ......................................................................... 11, 12, 16

*Spellissy v. United States*,
  103 Fed. Cl. 274 (2012) .............................................................................. 28

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ................................................................................ 39, 40

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ......................................................................... 34, 39, 40

*Tao v. Freeh*,
  27 F.3d 635 (D.C. Cir. 1994) ................................................................ 16, 17

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) .................................................................................... 22

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ................................................................................ 37, 38

*Trump v. United States*,
  603 U.S. 593 (2024) .................................................................................... 12

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ......................................................................... 32, 33, 34

*United States v. Alvarez,*
   567 U.S. 709 (2012).............................................................................12, 13

*United States v. Brewster,*
   408 U.S. 501 (1972)....................................................................................19

*United States v. Helstoski,*
   442 U.S. 477 (1979)....................................................................................18

*United States v. Lane,*
   64 M.J. 1 (C.A.A.F. 2006).........................................................................24

*United States v. McDade,*
   28 F.3d 283 (3d Cir. 1994).........................................................................19

*United States v. Menendez,*
   831 F.3d 155 (3d Cir. 2016).......................................................................19

*United States v. Rose,*
   28 F.3d 181 (D.C. Cir. 1994).....................................................................23

*United States v. Smith,*
   68 M.J. 316 (C.A.A.F. 2010).....................................................................12

*Xiaomi Corp. v. U.S. Dep't of Def.,*
   No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) .......................43

**Constitutional Provisions**

U.S. Cont., amend I..............................................................................*passim*

U.S. Const., amend V....................................................................................41

U.S. Const. art. I, § 5, cl. 2...........................................................................23

U.S. Const. art. I, § 6...............................................................................*passim*

U.S. Const. art. I, § 8...............................................................................15, 20

**Statutes**

5 U.S.C. § 701(b)(1) .....................................................................................36

5 U.S.C. § 704...............................................................................................32

5 U.S.C. § 705...........................................................................................4, 10

10 U.S.C. § 1161(a) ......................................................................................21

10 U.S.C. § 1370...................................................................................................*passim*

18 U.S.C. § 2441.............................................................................................................21

Act of Apr. 10, 1806, 2 Stat. 359.....................................................................................20

Uniform Code of Military Justice, Act of May 5, 1950,
    Pub. L. No. 81-506, ch. 169, 64 Stat. 108 (1950)..................................................20

**Other Authorities**

*The Federalist No. 76* (H. Lodge ed. 1888)......................................................................24

U.S. Dep't of Navy, JAGINST 5800.7G CH-2,
    *Manual of the Judge Advocate General* (Dec. 1, 2023) ....................................17, 33

Joint Service Comm. on Military Justice,
    Manual for Courts-Martial, United States pt.II, R. 916(d) (2024 ed.)....................12

Standing Rules of the Senate, S. Doc. No. 113-18, 113th Cong. (1st Sess. 2013).......21

U.S. Dep't of Navy, Sec'y of Navy Instr. 1920.6D, Enclosure 9, 2(a) (July 24, 2019) ...............35

## INTRODUCTION

Senator Mark Kelly is a retired Navy Captain and a sitting United States Senator who serves on the Senate's Armed Services Committee and Select Committee on Intelligence. A leading voice on military and national security issues since joining the Senate, Senator Kelly in recent months has made a series of statements addressing the appropriateness of military deployments and strikes, the conduct of senior defense officials, and the obligations of servicemembers under the Uniform Code of Military Justice—subjects squarely within the First Amendment's protections and the Senator's responsibilities under Article I of the Constitution. Those statements included a November 2025 video, in which Senator Kelly and five other Members of Congress reiterated servicemembers' longstanding and widely accepted legal obligation to disregard unlawful orders.

Executive Branch leaders swiftly responded with extreme rhetoric and punitive retribution. The President and the Secretary of Defense immediately denounced the video's statements as "treason" and "seditious," and warned that there would be consequences. The Department of Defense then followed with formal punishment. On January 5, Secretary Hegseth issued a Secretarial Letter of Censure declaring that Senator Kelly's speech "undermined the chain of command," "counseled disobedience," and constituted "conduct unbecoming an officer." Letter from Pete Hegseth, U.S. Sec'y of Defense, to Sen. Mark Kelly (Jan. 5, 2026) ("Ltr.") (attached as Ex. A). The Secretary's letter also threatened "criminal prosecution or further administrative action" if Senator Kelly continues to make similar statements. *Id.* At Secretary Hegseth's direction, and relying expressly and exclusively on his determinations, the Department of the Navy the same day initiated proceedings to "reconsider" the grade at which Senator Kelly retired nearly fifteen years ago, even though 10 U.S.C. § 1370 limits such post-retirement determinations to acts occurring during active military duty service.

1

Defendants' course of action is unlawful and must be halted. The First Amendment forbids the government and its officials from punishing disfavored expression or retaliating against protected speech. That prohibition safeguards the free-speech rights of all citizens, but it applies with particular force to legislators speaking on matters of public policy and oversight. As the Supreme Court held 60 years ago, the Constitution "requires that legislators be given the widest latitude to express their views on issues of policy," and the government may not recharacterize protected speech as supposed incitement in order to punish it. *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966). Yet the Secretary's letter makes clear on its face that he is disciplining Senator Kelly solely for the content and viewpoint of his political speech.

Defendants' actions also trample on protections the Constitution singles out as essential to legislative independence. The topics described in Secretary Hegseth's letter—statements about foundational principles of military law and concerns about potential commission of war crimes—are areas squarely within the legislative and oversight jurisdiction of the committees on which Senator Kelly serves. And the letter identifies criticism of the "firing of admirals and generals" as intolerable, even though those are personnel decisions by Secretary Hegseth and other senior defense officials over whom those same committees exercise oversight and whose appointments are subject to the Senate's advice and consent. In other words, all of that activity lies at the core of the Speech or Debate Clause.

It appears that never in our nation's history has the Executive Branch attempted to impose military sanctions on a sitting Member of Congress for engaging in disfavored political speech. Allowing that unprecedented step would invert the constitutional structure by subordinating the Legislative Branch to executive discipline and chilling congressional oversight of the armed forces

2

and intelligence community. And it would improperly usurp the authority to discipline legislators that the Constitution expressly assigns to the Congress.

The process that the Secretary of Defense has directed for reconsidering Senator Kelly's retirement grade independently violates due process. Before that proceeding began, the President publicly accused Senator Kelly of treason and sedition and demanded punishment. The Secretary of Defense echoed those accusations, announced an investigation, and then issued a Letter of Censure that—not tentatively, but conclusively—determined that Senator Kelly's speech met the very criteria that the Department must consider when reducing retirement grade. Any subsequent "review" of Senator Kelly's grade by the Secretary is therefore foreordained. The Constitution does not permit the government to announce the verdict in advance and then subject an individual to a nominal process designed only to implement it.

Nor does the statute that Defendants invoke provide any basis to conduct such a proceeding. Section 1370 governs the grade at which an officer is retired based on whether the officer "served on active duty satisfactorily." 10 U.S.C. § 1370(a)(1). Senator Kelly's "active duty" is long since complete; he served honorably as a Captain with a remarkable record of awards and commendations, and his retirement grade became final by operation of law at the time of his retirement. *Id.* § 1370(f). Nothing in that statute authorizes the Department of Defense to reopen that determination based on post-retirement political speech—and if it did, it would raise serious constitutional concerns and subject all of the nation's retired veterans to an ever-present threat against their retirement.

If permitted to stand, the Secretary's censure and the grade-determination proceedings will inflict immediate and irreparable harm. Defendants' actions impose official punishment for protected speech, chill the exercise of legislative oversight, and threaten reductions in rank and

pay. They also signal to retired servicemembers and Members of Congress alike that criticism of the Executive's use of military power may be met with retaliation through military channels.

These are here-and-now injuries that constitute constitutional and reputational harms regardless of any subsequent determination. The Constitution does not leave such injuries to be remedied after the fact. Speech or Debate, First Amendment, separation-of-powers, and due-process protections must be vindicated at the outset, before the Senator is forced to submit to an unconstitutional proceeding.

Senator Kelly therefore seeks a temporary restraining order, a preliminary injunction, and a stay under 5 U.S.C. § 705 halting the effect of the Secretarial Letter of Censure, the reopening of his retirement grade, and any other proceedings predicated on these actions.

Senator Kelly requests this emergency relief by Friday, January 16. He does so because the clock is ticking in these unlawful proceedings, and any further delay will compound the irreparable harm. In particular, Defendants' notification regarding Senator Kelly's retirement grade demands a response "within 10 working days" and asserts that "[f]ailure to respond shall constitute a waiver of these rights." Letter from J.J. Czerkewko, Chief of Naval Personnel, to Sen. Mark Kelly at 1 (Jan. 5, 2026) (attached as Ex. B). Emergency relief is necessary to prevent grave constitutional injury, and to forestall further prejudice to Senator Kelly's rights should he be forced to participate in these unlawful, predetermined proceedings.

## STATEMENT OF FACTS

### A.    Senator Kelly's Military and Congressional Service

Senator Mark Kelly—a retired U.S. Navy Captain and a member of the Senate Armed Services Committee and Senate Select Committee on Intelligence—has been a prominent voice on military issues since Arizona voters elected him to the Senate in 2020. Over his 25-year Navy career, Senator Kelly rendered exceptionally distinguished service to the Nation, including

multiple deployments aboard the USS Midway, 39 combat missions as a naval aviator during the First Gulf War, and four space shuttle flights for NASA, culminating in command of the final flight of Endeavour. He retired honorably in 2011 as a Captain, having earned numerous decorations for heroic and meritorious service, perseverance under extraordinary danger, and devotion to duty. *See* Compilation of Select Military Awards (attached as Ex. C). Since his election to the Senate, Senator Kelly has continued that service through sustained leadership on military and national security matters. Compl. ¶¶ 25-27 (reciting examples).

**B.    The Administration's Military Actions and Senator Kelly's Statements**

Since August 2025, the Administration's military actions have been the subject of sustained congressional oversight and intense public debate. Compl. ¶¶ 31-50. President Trump has federalized and deployed National Guard troops to cities across the country, including Washington, D.C., Los Angeles, Portland, and Chicago. Compl. ¶ 32. The Administration also initiated a campaign of 21 lethal strikes on boats between September 2, 2025, and November 15, 2025, reportedly killing 83 people in the Caribbean Sea and Pacific Ocean. Compl. ¶ 39. The first of these strikes garnered significant congressional and media attention after press reported that an order was given to kill two survivors of a boat that already had been destroyed by a missile. Compl. ¶¶ 40-43. The Administration's actions have prompted congressional inquiries, briefings, proposed legislation, new restrictions on Department of Defense funds, and committee oversight. Compl. ¶¶ 35-38, 44-48.

Since those actions began, Senator Kelly has been fully engaged in congressional oversight, has introduced legislation, and has articulated thoughtful policy positions related to the Administration's decisions. As the President federalized and deployed National Guard troops domestically, Senator Kelly responded with proposed legislation as a co-sponsor of the "No Troops in Our Streets Act," S. 3167, 119th Cong.—legislation that would enhance congressional

authority to terminate National Guard deployments—and the "Notification of Troop Involvement and Congressional Engagement Act," S. 3449, 119th Cong., which would require the President to notify Congress and provide a clear justification before deploying the National Guard for law enforcement purposes. Compl. ¶¶ 36, 38. As questions mounted about the Administration's campaign of lethal strikes against alleged drug-smuggling boats, Senator Kelly and the other members of the Senate Armed Services Committee conducted oversight through briefings and formal requests to the Department and Secretary Hegseth to provide them with "additional information" on the "legal and policy" justifications for the strikes. Compl. ¶ 45.

On November 18, 2025, Senator Kelly and five other Armed Services Committee members—all with distinguished careers in the armed forces or intelligence community—posted a video online called "Don't Give Up the Ship" addressed to the military and intelligence community. Compl. ¶ 51. The video emphasized servicemembers' legal obligations and oath to the Constitution, stating in part, "Our laws are clear. You can refuse illegal orders . . . No one has to carry out orders that violate the law or our Constitution. . . . We need you to stand up for our laws, our Constitution, and who we are as Americans. Don't give up the ship." Compl. ¶ 52.

### C.    Defendants' Response and Punitive Actions Against Senator Kelly Based on Public Statements

Despite the accuracy of the video and the statements of its participants, the Administration immediately responded with threats of death, prosecution, imprisonment, and violence. On November 20, President Trump publicly characterized the video as "SEDITIOUS BEHAVIOR, punishable by DEATH!" Compl. ¶ 66; Decl. of Samuel F. Callahan ¶ 8 (attached as Ex. D). President Trump labeled the six Congress members "TRAITORS," called to "LOCK THEM UP," declared they should be "ARRESTED AND PUT ON TRIAL," and reposted content advocating to "HANG THEM" and calling them "traitorous sons of bitches" who "should be impeached and

prosecuted." Compl. ¶¶ 64-65, 67, 72; Ex. D. ¶¶ 6, 7, 9, 11, 14. Secretary Hegseth began referring to the congressmembers as the "Seditious Six." Compl. ¶ 76; Ex. D. ¶ 16.

On November 24, the Department of Defense posted on its official X page that it was conducting a "thorough review" of "serious allegations of misconduct" and threatened to "recall [Senator Kelly] to active duty for court-martial proceedings." Compl. ¶ 75; Ex. D. ¶ 15. On November 25, Secretary Hegseth referred the matter of "potentially unlawful comments" to the Secretary of the Navy and directed him to provide Secretary Hegseth "a brief on the outcome of your review by no later than December 10." Compl. ¶ 78.

On December 15, after media reports that the Secretary of the Navy had forwarded his review to the Department of Defense's General Counsel, Senator Kelly's counsel sent a letter to the Secretary of the Navy explaining that there was no legitimate basis for any proceeding against the Senator and explaining that counsel would take appropriate legal action if the agency moved forward. Compl. ¶ 81; Ex. E-2 to Decl. of Paul Fishman (attached as Ex. E). Following further press reports, the Senator's counsel followed up with a letter to Secretary Hegseth on December 18 requesting that the Department immediately confirm the scope of and authority for any investigation. Compl. ¶ 83; Ex. E-3. Defendants acknowledged receipt but otherwise never responded to either letter. Compl. ¶ 85; Ex. E-4.

Instead, on January 5, 2026, Senator Kelly's counsel received, by email, a Secretarial Letter of Censure against the Senator. Compl. ¶ 86; Ex. E ¶ 6. The letter made several adverse "determination[s]" and "formally CENSURE[D] [Senator Kelly] for conduct prejudicial to good order and discipline in the armed forces and conduct unbecoming an officer." Ltr. at 2. In particular, the letter "determin[ed]" that Senator Kelly had engaged in speech that (1) "undermines the chain of command"; (2) "counsels disobedience"; (3) "creates confusion about duty";

(4) "brings discredit upon the armed forces"; and (5) "is conduct unbecoming an officer." *Id.* at 1-2 (capitalizations omitted).

Although Secretary Hegseth's initial reactions in November, and his referral to the Secretary of the Navy, had been expressly predicated on the November 18 video, the letter recounted that Secretary Hegseth had made these findings based on "a sustained pattern of public statements" by Senator Kelly. Ltr. at 1. In that regard, the Secretary's letter identified three categories of statements as the basis for his findings: (1) reminders to servicemembers of their duty to refuse unlawful orders; (2) criticism of military leadership (*e.g.*, "for 'firing admirals and generals' and surrounding themselves with 'yes men'"); and (3) expressions of concern that certain military operations might be illegal. *Id.* at 1-2. According to Secretary Hegseth, when he viewed Senator Kelly's statements "in totality," they "were not providing abstract legal education" but instead "demonstrate[] specific intent to counsel servicemembers to refuse lawful orders." *Id.*

Secretary Hegseth then advised that the "Letter of Censure will be placed in [Senator Kelly's] office military personnel file." Ltr. at 3. While the letter also noted that Senator Kelly can submit a rebuttal within 30 days that would also be included in his file, the Senator "do[es] not have a right to appeal this administrative action." *Id.*

In addition to its adverse determinations, the letter found that "good cause exists to reopen the determination of your retired grade" and announced that the Secretary "will direct the Secretary of the Navy to recommend . . . whether a reduction in grade is appropriate." Ltr. at 3. "After receiving the Secretary of the Navy's recommendation," Secretary Hegseth "will determine if a reduction is warranted." *Id.* "Any reduction in retired grade would result in a corresponding reduction in retired pay." *Id.*

The letter ended with a stark warning: "as a retired Naval officer, you remain subject to the Uniform Code of Military Justice. If you continue to engage in conduct prejudicial to good order and discipline, you may subject yourself to criminal prosecution or further administrative action." Ltr. at 3.

That same day, the Chief of Naval Personnel transmitted a "Notification of Retirement Grade Determination Proceedings." Ex. B at 1. The document informed Senator Kelly that his "retirement paygrade will be revisited"—citing the letter of censure as the sole "factual basis supporting this action." *Id.* The notification requested that Senator Kelly respond "within 10 working days" and declared that "[f]ailure to respond shall constitute a waiver of these rights." *Id.*

Two days later, on January 7, counsel for Senator Kelly wrote to Secretary Hegseth; outlined the censure letter's constitutional and statutory deficiencies; demanded that he rescind the letter and halt any further actions predicated on it; and asked for confirmation that the Department of Defense is preserving all documents relevant to these matters. Compl. ¶¶ 109-11; Ex. E-7. Counsel requested that the Department respond in writing by January 9 that it had taken these steps, and advised that the Senator would proceed accordingly if he received no satisfactory response. Compl. ¶ 110; Ex. E-7. The Department's General Counsel responded on January 8 to acknowledge receipt and indicate that the Department will "preserve all relevant materials as required by law." Compl. ¶ 112; Ex. E-8. Defendants have not otherwise responded.

The Administration's controversial military actions have continued—as have responses from Members of Congress, including Senator Kelly. Compl. ¶¶ 30-31, 48, 139. The Senator intends to continue to discharge his senatorial duty to speak out on these issues. Compl. ¶¶ 116-18.

**LEGAL STANDARD**

A plaintiff is entitled to a temporary restraining order and preliminary injunction upon showing (1) a likelihood of success on the merits; (2) a likelihood that he would suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) (same for temporary restraining orders). The first factor—likelihood of success on the merits—is the "most important." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). And the last two factors "merge when the Government is the opposing party." *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay" under the Administrative Procedure Act. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

**ARGUMENT**

Senator Kelly meets all of the factors warranting emergency relief. The Court should immediately stay and enjoin the Defendants' actions and issue all relief necessary to preserve the status quo.

**I.    Senator Kelly Is Likely to Succeed on the Merits**

Defendants' actions violate the First Amendment, the Speech or Debate Clause, the constitutional separation of powers, and due process. Defendants also lack any statutory basis to undertake any grade-reduction proceedings against Senator Kelly. Each violation provides ample basis for immediately blocking Defendants' actions.

### A.    Defendants' Actions Violate the First Amendment

Defendants' extraordinary efforts to silence disfavored political speech constitute impermissible viewpoint discrimination and unlawful retaliation in violation of the First Amendment. "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135-36. And needless to say, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions.").

Defendants are punishing a retired servicemember and sitting U.S. Senator for expressing views on pressing issues of public policy that Defendants disfavor. But the Constitution does not permit the government to "punish or suppress disfavored expression," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024), or to retaliate against such expression, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Defendants' actions violate the First Amendment on both bases.

### 1.    Punishing a Retired Servicemember and Sitting Senator for Protected Speech Violates the First Amendment

First, Defendants' actions are forbidden because they target protected speech on both content- and viewpoint-discriminatory grounds, and they cannot be justified under any applicable standard of scrutiny. The Secretary's letter states openly that the Department's actions are predicated—and *exclusively* so—on Senator Kelly's "public statements." Ltr. at 1. The letter asserts that Senator Kelly engaged in three categories of speech that, according to the Secretary, deserve punishment: (1) reminders to servicemembers of their duty to refuse unlawful orders; (2) criticism of military leadership for "firing admirals and generals" and surrounding themselves

with "yes men"; and (3) expressions of concern that certain military operations might be illegal. As "speech on public issues," all three categories of statements receive the "highest" First Amendment protection. *Snyder*, 562 U.S. at 452.

To take each in order: The First Amendment protects an entirely accurate summary of the laws that govern our armed forces—a summary that now–Attorney General Bondi has herself previously recited. *See* Brief of Three Former Senior Military Officers and Executive Branch Officials as Amici Curiae Supporting Petitioner at 9, *Trump v. United States*, 603 U.S. 593 (2024) ("Military Officers Are Required Not to Carry Out Unlawful Orders"); *see also* Department of Defense, *Department of Defense Law of War Manual* § 18.3.2 (July 31, 2023) ("Members of the armed forces must refuse to comply with clearly illegal orders to commit law of war violations."); Joint Serv. Comm. on Military Justice, Manual for Courts-Martial, United States pt.II, R. 916(d) (2024 ed.); *United States v. Smith*, 68 M.J. 316, 319 (C.A.A.F. 2010). Senator Kelly's truthful statements about military obligations—regardless of Defendants' agreement with them—are unquestionably protected speech. *See United States v. Alvarez*, 567 U.S. 709, 719-22 (2012). "The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace." *Id.* at 729.

The other categories of speech identified in the letter are fully protected as well. Secretary Hegseth ascribed to Senator Kelly statements "characterizing" military "operations as illegal," "public accusations of war crimes," and critiques of "military leadership for 'firing admirals and generals.'" Ltr. at 1-2. But the Supreme Court has repeatedly emphasized our "profound national commitment" to "uninhibited, robust, and wide-open" political debate, including "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. "[S]peech concerning public affairs" is "the essence of self-government,"

*Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964), and "there can be no question but that the First Amendment protects expressions in opposition to national foreign policy," *Bond*, 385 U.S. at 132.

Defendants admit that they are not only targeting Senator Kelly's speech, but that they are doing so on the basis of its content and viewpoint. The Secretary makes clear in his letter that the Department is punishing Senator Kelly based both on the content of his statements (*e.g.*, that the statements relate to the lawfulness of "military operations" and the "firing admirals and generals") and their viewpoint (*e.g.*, that they supposedly "characterize[] military operations as illegal," "criticiz[e]" military leadership for firing admirals and generals and surrounding themselves with "yes men," and "accuse" certain military officials of war crimes). Ltr. at 1-2.

Executive sanctions targeting an individual's speech based on its content or its viewpoint trigger the strictest constitutional scrutiny and are "presumptively unconstitutional"—justifiable "only if the government proves that" its restrictions "are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination is an "egregious form of content discrimination"). Defendants' punishments would be unconstitutional if levied against a private citizen, and their application to a Member of Congress only magnifies the offense. Defendants have no compelling interest in punishing the speech of a sitting U.S. Senator, whether through censure, reopening of a grade determination, or threatening criminal prosecution. Nor are Defendants' actions narrowly tailored to serve any purported governmental interest. Defendants "cannot show[] why counterspeech," for instance, "would not suffice to achieve its interest." *Alvarez*, 567 U.S. at 726.

In fact, the Supreme Court has already squarely held that punishing a legislator for his speech violates the First Amendment. In *Bond v. Floyd*, 385 U.S. 116 (1966), the Georgia House

of Representatives refused to seat a duly elected member—Julian Bond—based on his criticisms of the Vietnam War and draft. When Bond sued, the Georgia House "attempt[ed] to circumvent" the First Amendment interests at stake, arguing that it was not targeting Bond's views per se, but rather that his remarks "showed that he 'does not and will not' support the Constitutions of the United States and of Georgia" and that his statements violated a federal law punishing anyone who counsels, aids, or abets the evasion of draft registration. *Id.* at 123-25, 133, 135. The Supreme Court unanimously rejected these arguments and held that excluding Representative Bond from the Georgia House violated the First Amendment. *Id.* at 135-37. The Court emphasized that "[l]egislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them." *Id.* at 136-37. *Bond* governs this case.

The Secretary's letter theorizes that "[w]hen viewed in totality," Senator Kelly's "pattern" of statements "were not providing abstract legal education" but "were specifically counseling servicemembers to refuse particular operations that you have characterized as illegal." Ltr. at 2. That is a misreading of the video. But even assuming the accuracy of the Secretary's inferences, the distinction he draws is immaterial for constitutional purposes. What matters is not whether any statements correctly determined the legality of a military operation or even whether he "advoca[ted]" for unlawful conduct. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Rather, such statements could fall outside First Amendment protections only if they (1) were "directed to inciting or producing *imminent* lawless action" *and* (2) were "likely to incite or produce such action." *Id.* (emphasis added).

Defendants could not possibly make those required showings. The remarks they ascribe to the Senator do not—expressly or implicitly—advocate for lawless action of any kind. Even forceful, highly charged advocacy for lawless behavior has long been held protected by the First

Amendment. *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 107 (1973) (anti-war demonstrator loudly told other protestors, in front of Sheriff, that "[w]e'll take the f***king street later"); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982) (civil rights activist gave speech to "several hundred people" declaring that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck"). The statements Defendants invoke did the opposite: They told servicemembers *not* to break the law. They critiqued government conduct that might have been *unlawful*. That is not incitement to lawlessness; it is a call for adherence to the law.

Nor does the military context of any statement alter the First Amendment inquiry. To be sure, *active-duty* members of the military face some restrictions on their speech that other citizens do not. *See Parker v. Levy*, 417 U.S. 733, 758-61 (1974). The Supreme Court has grounded those differences in "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline," which "may render permissible within the military that which would be constitutionally impermissible outside it." *Id.* at 758. But whatever the bounds of this First Amendment exception for active-duty personnel, there appears to be *no* court decision ever extending these principles to retired veterans. Such an extension would raise significant constitutional concerns, not only under the First Amendment, but under Congress's limited authority to "make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, which has not conclusively been held to allow punishment of post-retirement conduct, *infra* p. 32. And whatever application a carve-out could plausibly have for speech made in direct connection to military service, the statements identified in Secretary Hegseth's letter were unquestionably made in Senator Kelly's capacity *as a legislator*—and as a legislator charged with congressional oversight of the armed forces, no less. To excuse the suppression of speech because it relates to military operations would eviscerate the constitutional

safeguards that define our democracy. The First Amendment applies with full force here, and it renders Defendants' actions unconstitutional.

2.    *Defendants' Actions Amount to Unconstitutional First Amendment Retaliation*

The result is the same under the "contemporary" First Amendment retaliation test. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). "As a general matter the First Amendment prohibits government officials from subjecting [someone] to retaliatory actions for engaging in protected speech" or activity. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). To succeed on a First Amendment retaliation claim, a plaintiff must prove that (1) the plaintiff engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from engaging in protected conduct; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against it. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Each requirement is met here.

First, for all the reasons discussed above, Senator Kelly's speech was protected by the First Amendment. *Supra* section I.A.1; *see Snyder*, 562 U.S. at 452 ("[S]peech on public issues . . . is entitled to special protection"). Speech by legislators on matters of public policy receives the fullest First Amendment protection, *Bond*, 385 U.S. at 135-36, and no First Amendment carve-outs apply.

Second, while Senator Kelly has not been silenced, Defendants have taken actions against him that would deter the speech of "a person of ordinary firmness." *Aref*, 833 F.3d at 258. Although determining "whether retaliation would chill a speaker of ordinary firmness . . . requires some guesswork," the "bar is not a high one." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 & n.7 (D.D.C. 2025). Retaliatory actions "need not be . . . significant" to "raise a constitutional claim" for First Amendment retaliation. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir.

1994). The Supreme Court has held, for instance, that the First Amendment protects individuals from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 76 n.8 (1990) (citation omitted); *see also Tao*, 27 F.3d at 639 ("If employees who exercise free speech find themselves facing more burdensome promotion requirements than those employees who remain silent, they are unlikely to speak freely on matters of public concern.").

Defendants' actions are much more extreme. The Secretary has ordered the reopening of a grade determination to reduce the Senator's rank and threatened criminal proceedings and other sanctions if the Senator continues to speak. The censure itself will be used as "[t]he factual basis supporting" the upcoming grade determination, during which the Secretary of the Navy "will review the circumstances" of that censure and "make a recommendation" based on it. Ex. B at 1. Once the censure is "placed in [Senator Kelly's] official military personnel file," Ltr. at 3, it may be used in "any . . . administrative action on the part of the service concerned," at any time in the future, U.S. Dep't of Navy, JAGINST 5800.7G CH-2, *Manual of the Judge Advocate General*, sec. 0114A(b) (Dec. 1, 2023), https://bit.ly/49ybm7m. The Secretary's letter is not a mere "censure of one member of an elected body by other members of the same body" absent "any other form of punishment." *Houston*, 595 U.S. at 482. To the contrary, the censure severely disadvantages Senator Kelly in any military disciplinary proceedings, including the ones in which he is fighting for his grade and pension. Secretary Hegseth said so himself: "Reducing a rank or pay is a serious administrative action that sends real signals that we take these things incredibly seriously. . . . I don't think anybody should minimize how significant this is." Compl. ¶ 114.

Senators from both sides of the aisle have acknowledged that the Secretary's censure of Senator Kelly "has a chilling effect on speech." Alexander Bolton, *2 GOP Senators Caution Hegseth on Punishing Kelly* (Jan. 5, 2026), https://bit.ly/45LIJCg. And while Defendants' actions have not silenced Senator Kelly himself, he has a demonstrated history of extraordinary bravery—including on four missions to space, and risking his life on numerous occasions during his thirty-nine combat missions for the United States Navy. Compl. ¶¶ 21, 116-18. His exceptional resilience does not give Defendants license to punish his dissent and chill others'. *Cf. Jenner*, 784 F. Supp. 3d at 115 ("Retaliation against [one] threatens retaliation against all.").

*Third*, the causal link between Senator Kelly's protected speech and Defendants' actions is indisputable. The censure letter says on its face that it is based on Senator Kelly's "public statements" and "public accusations." Ltr. at 1-2. The First Amendment prohibits Defendants' retaliatory actions.

## B.    Defendants' Actions Violate the Speech or Debate Clause

Defendants have punished—and will continue to punish—Senator Kelly for legislative acts, and for that reason their actions must be enjoined under the Speech or Debate Clause of Article I.

### 1.    The Speech or Debate Clause Broadly Protects Legislative Acts

The Speech or Debate Clause provides that "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6. The "fundamental purpose" of this clause is to free "the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *United States v. Helstoski*, 442 U.S. 477, 492 (1979) (quoting *Gravel v. United States*, 408 U.S. 606, 618 (1972)). It was "written into the Constitution" not "for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by *insuring the independence of individual*

*legislators.*" *Id.* at 493 (quoting *United States v. Brewster*, 408 U.S. 501, 507 (1972)). Accordingly, the Supreme Court has "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975).

As then-Judge Alito recognized in *United States v. McDade*, 28 F.3d 283, 300 (3d Cir. 1994), the clause's broad scope "clearly" reaches congressional oversight. *See Eastland*, 421 U.S. at 504; *United States v. Menendez*, 831 F.3d 155, 167-68 (3d Cir. 2016). The clause covers all "legislative act[s]," not just "literal speech or debate." *Eastland*, 421 U.S. at 501-04. Oversight counts as a legislative act because it "is the way Congress evaluates legislation, and in the appropriate manner, monitors the operations of executive departments and agencies." *McDade*, 28 F.3d at 304 (Scirica J., concurring); *see Eastland*, 421 U.S. at 504 (similar). Congressionally authorized oversight thus "merit[s] Speech or Debate immunity." *Menendez*, 831 F.3d at 169.

When the clause applies, its protections are broad. It shields "[m]embers against prosecutions that directly impinge upon or threaten the legislative process," immunizing them completely for these legislative acts. *Gravel*, 408 U.S. at 616. That immunity blocks all manner of adversarial "question[ing] in any other Place," U.S. Const. art. I, § 6, cl. 1, in the form of any "civil [or] criminal" proceedings whatsoever, *Eastland*, 421 U.S. at 502-03. And the immunity is "absolute." *Id.* at 503. "[O]nce it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference," even if the act would otherwise be unlawful. *Id.* (quoting *Doe v. McMillan*, 412 U.S. 306, 314 (1973)).

The clause's absolute bar can be asserted through affirmative litigation, or as a threshold defense that bars adversarial proceedings. *See Gravel*, 408 U.S. at 608-09. Either way, because the clause shields Members "not only from the consequences of litigation's results but also from the burden of defending themselves," speech or debate claims must be resolved as early as possible in

a case. *Hutchinson v. Proxmire*, 443 U.S. 111, 123 (1979). An order denying legislative immunity is immediately appealable as a "collateral order." *In re Sealed Case*, 80 F.4th 355, 361 (D.C. Cir. 2023). Otherwise, legislators could not benefit from the full scope of the clause's protections—which "would be of little value if legislators could be subjected to the cost and inconvenience and distractions of a trial" predicated on their legislative acts. *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (cleaned up).

### 2.     The Statements Were Legislative Acts

The statements identified in Secretary Hegseth's letter were protected "[l]egislative acts." *Gravel*, 408 U.S. at 624-25. The speech that Defendants ascribe to Senator Kelly related to military operations and leadership, and the obligations of servicemembers and leadership under the law of armed conflict. Ltr. at 1-2. Those subjects sit at the heart of Congress's Article I responsibilities—war powers, appropriations, oversight of the armed forces, and the creation and regulation of the military justice system.

To start, Article I of the Constitution expressly places the regulation of our armed forces within Congress's legislative powers. Among other enumerated authorities, Congress has the power to "declare War"; to "make Rules concerning Captures on Land and Water"; to "raise and support Armies"; to "provide and maintain a Navy"; and to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cls. 11-14. Congress has, since the founding, exercised those authorities to legislate a military justice system, *see, e.g.*, Act of Apr. 10, 1806, 2 Stat. 359 (enacting 101 "rules and articles by which the armies of the United States shall be governed"), including through its enactment of the Uniform Code of Military Justice ("UCMJ"), Act of May 5, 1950, Pub. L. No. 81-506, ch. 169, 64 Stat. 108 (1950).

Congress—and Senator Kelly's committees in particular—have also long exercised authority over military and civilian defense appointments. After the Civil War, Congress passed a

law providing that "[n]o commissioned officer may be dismissed from any armed force except—(1) by sentence of a general court-martial; (2) in commutation of a sentence of a general court-martial; or (3) in time of war, by order of the President." 10 U.S.C. § 1161(a). The Senate Armed Services Committee, of which Senator Kelly is a member, exercises the Senate's constitutional advice-and-consent authority by reviewing presidential nominations for, and overseeing, senior appointments to the Department of Defense and military branches. *See* Standing Rules of the Senate, S. Doc. No. 113-18, at 43-44 113th Cong. (1st Sess. 2013) (Rule XXXI); *id.* at 20 (Rule XXV, 1(c)(1)). This is in addition to the Committee's broad jurisdiction over "[a]eronautical . . . activities peculiar to or primarily associated with . . . military operations," to the "Common defense," and to the "Department of Defense, the Department of the Army, the Department of the Navy, and the Department of the Air Force, generally." *Id.* at 20 (Rule XXV, 1(c)(1)).

Congress has also historically exercised its myriad powers to weave international laws of war into domestic law, including through criminal prohibitions, *see, e.g.*, 18 U.S.C. § 2441, and by exercising the Senate's constitutional treaty-ratifying role, *see, e.g.*, Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287. And Congress passes a National Defense Authorization Act every year, setting forth the policy and funding priorities for the military for the following year. *E.g.*, S. 2296, 119th Cong. (2025).

Every category of statements identified in Secretary Hegseth's letter falls squarely within this "legislative sphere." *Eastland*, 421 U.S. at 503. The statements that the letter ascribes to Senator Kelly concern: the lawfulness of military "orders related to National Guard deployments and counter-narcotics operations," servicemembers' obligations not to follow unlawful orders,

criticism of military leadership for "firing admirals and generals," and "war crimes." Ltr. at 1-2. Each falls within Congress's jurisdiction described above. Criticism of military leadership for firings, for example, is in the core of the Armed Services Committee's jurisdiction over appointments.

The surrounding context of these statements reinforces that these were legislative acts. The video that the letter references, for example, was posted publicly on official Senate and House social media accounts, including Senator Kelly's. It addressed servicemembers' obligations under existing laws that the Members and their committees oversee—a quintessential exercise of oversight authority with an eye toward future legislative action to clarify or strengthen the law. These statements came amid ongoing committee investigations and hearings about the military's actions, Compl. ¶¶ 31-61, and while Senator Kelly and others were actively pursuing legislation on these same issues, including the No Troops in Our Streets Act, S. 3167, 119th Cong. (2025).

The statements ascribed to Senator Kelly were not mere "attempts to influence the conduct of executive agencies." *Hutchinson*, 443 U.S. at 121 n. 10. Rather, they signaled deep concerns about military actions of this Administration, contributed to ongoing legislative debate, and signaled that the Senator would take further legislative or oversight action on these very topics, as he has already done. Defendants' actions thus rest on the statements of an elected representative *as a representative*, which the Supreme Court has long held to be squarely protected. *See McMillan,* 412 U.S. at 314. As such, "[s]elf-discipline and the voters" are the mechanisms our Constitution provides for expressing disagreement with congressional speech on legislative matters. *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). Executive Branch punishment and attempted intimidation are not.

### C.    Defendants' Actions Violate the Separation of Powers

Broader separation-of-powers principles lead to the same conclusion. The "doctrine of separation of powers" lies "at the heart of our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 119 (1976). Allowing Defendants to punish a Senator through military proceedings for his political speech eviscerates that separation and gives the Executive a power over legislators that the Constitution expressly confers instead on the Congress. Separation-of-powers jurisprudence is animated by two primary concerns—"encroachment and aggrandizement." *Mistretta v. United States*, 488 U.S. 361, 382 (1989). The Executive's actions here do both. And the "lack of precedent" for these extraordinarily intrusive actions "counsels great restraint . . . before approving this additional incursion" by one branch against another. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010).

First, Defendants assert the power to discipline a Member of Congress for his conduct as a Senator merely because he once held a military commission. But the Constitution already assigns this function: Article I provides that "[e]ach House may determine the Rules of its Proceedings, *punish its Members for disorderly Behaviour*, and, with the Concurrence of two thirds, expel a Member." U.S. Const. art. I, § 5, cl. 2 (emphasis added). The Executive may not usurp Article I powers textually dedicated to the Congress, particularly when "Congress has [not] empowered" the Executive expressly to do so. *United States v. Rose*, 28 F.3d 181, 190 (D.C. Cir. 1994); *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (holding that line-item veto improperly assigned legislative powers to the President); *see also Mistretta*, 488 U.S. at 382 (explaining that "our separation-of-powers jurisprudence" prevents the "separate Branches" from "undermin[ing] the authority and independence of one or another coordinate Branch").

Defendants' actions, moreover, rest on the premise that Senator Kelly remains part of the military and subject to military discipline, even while serving as Senator. That premise is foreclosed by the Incompatibility Clause of the Constitution, which expressly forbids Members of Congress from simultaneously "holding any Office under the United States," including a military office, U.S. Cont. art. I, § 6. By prohibiting simultaneous service in both the executive and legislative branches, the Incompatibility Clause embodies the "concern of the Framers of the Constitution with maintenance of the separation of powers." *Buckley*, 424 U.S. at 124. In particular, the Clause "guards against the danger of executive influence upon the legislative body," *The Federalist No. 76*, p. 476 (H. Lodge ed. 1888), and is "essential to the structural integrity of the Constitution," *United States v. Lane*, 64 M.J. 1, 7 (C.A.A.F. 2006). Allowing military discipline of a sitting Member of Congress—who cannot constitutionally serve as a military officer—defies this mandated separation. Thus, even if Defendants were correct about their statutory authority to censure and demote retired servicemembers in general, "separation-of-powers considerations" require a different conclusion in this case, where military punishment threatens "a coequal branch of Government." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004).

Second, Defendants' actions unduly interfere with Congress's core constitutional functions. Subjecting a sitting Member to military punishment for statements like those Defendants have identified does not merely create abstract tension between the branches; it directly burdens Congress's ability to investigate, oversee, and criticize the Executive's use of the armed forces. Robust, uninhibited debate over the legality of military operations is central to Congress's powers to declare war, regulate the armed forces, appropriate funds, and conduct oversight. *E.g.*, *Gravel*, 408 U.S. at 616 ("The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from

the Executive Branch."); *see also supra* section I.B. When Members must weigh the risk of being hauled before military officials against their constitutional obligation to hold the Commander-in-Chief and his appointees to account, the result is a powerful chilling effect that distorts legislative deliberation and undermines the "independent functioning of each coequal branch of government within its assigned sphere of responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 760-61 (1982) (Burger, J., concurring).

The novelty of Defendants' actions confirms their unconstitutionality. When "interpretive questions . . . concern the allocation of power between two elected branches of Government," "[l]ong settled and established practice is a consideration of great weight." *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (quoting *The Pocket Veto Case,* 279 U.S. 655, 689 (1929)). When agency actions "lack[] [such] a foundation" and "clash[] with constitutional structure," courts do not hesitate to hold that they "violate[] the separation of powers." *Seila Law LLC v. CFPB*, 591 U.S. 197, 204-05 (2020). To the best of counsel's knowledge, military punishment has never been inflicted on a sitting Member of Congress based solely on his speech.[1] For good reason: A Constitution that protects robust legislative independence cannot tolerate an Executive Branch that treats political dissent in Congress as an offense. The Supreme Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it," *Buckley*, 424 U.S. at 123, and the Court should do so here.

---

[1] The closest historical example of which counsel is aware is President Lincoln's arrest and military detention, under a suspension of habeas corpus during the Civil War, of a Member of Congress for his alleged support of the Confederacy. The arrestee, Representative Henry May of Maryland, was released without charges after several months and returned to his seat. *See Maryland Voices of the Civil War* 237 (Charles W. Mitchell ed., Johns Hopkins Univ. Press 2007). Unlike here, no punishment was issued, and the Supreme Court later cast doubt on the lawfulness of prolonged detentions without judicial review during the period. *See Ex parte Milligan*, 71 U.S. 2 (1866).

**D.      Defendants' Actions Violate Due Process**

The Due Process Clause and related principles under the Administrative Procedure Act require government decisionmakers to keep an open mind before taking adverse action against an individual. Agency decisions violate due process when they have been "prejudged" by pertinent Executive Branch officials, because agencies must "exercise [discretionary] authority according to [their] own understanding and conscience." *Bufalino v. Kennedy*, 322 F.2d 1016, 1018-19 (D.C. Cir. 1963) (quoting *Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954)). Where a "disinterested observer may conclude that [an agency adjudicator] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it," the agency has "deni[ed] . . . due process." *Cinderella Career & Finishing Schs. Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970).

Secretary Hegseth—who declares himself in the letter to be the agency decisionmaker here—has unambiguously "adjudged" the decision to reduce Senator Kelly's grade, regardless of further proceedings. *Id.* The censure letter already concludes that Senator Kelly's protected speech "undermines the chain of command," "counsels disobedience," "creates confusion about duty," "brings discredit upon the Armed Forces," and is "unbecoming" of an officer. Ltr. at 2 (capitalization omitted). These determinations parrot the standards that, under Naval regulations, justify a reduction in grade: a grade reduction is appropriate when an officer commits an act that "brings discredit upon the armed services," prejudices the "ability of the military unit or the organization to maintain discipline, good order, and morale," or brings "disregard . . . of customary superior-subordinate relationships." U.S. Dep't of Navy, Sec'y of Navy Instr. 1920.6D, Enclosure (9), 2(c) (July 24, 2019), https://bit.ly/4a3oAuy. And indeed, the Chief of Naval Personnel's letter notifying Senator Kelly of the grade determination proceedings confirms that the sole "factual basis supporting this action is a Secretary of War letter of censure." Ex. B at 1. The determinations

contained in the censure letter therefore make any new grade determination a sham—precisely the kind of foreordained decisionmaking due process forbids.

Secretary Hegseth's public statements about "the case he was to hear" further establish that the underlying decision to censure Senator Kelly was preordained. *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (citing *Cinderella*, 425 F.2d at 589-90). On the same day that the Department of Defense announced it was reviewing "serious allegations of misconduct against Captain Mark Kelly," Secretary Hegseth posted that the video Senator Kelly participated in was "Seditious," "despicable, reckless, and false." Compl. ¶ 160. Secretary Hegseth explicitly tied this purportedly "[s]editious" behavior to the Department's "review[ of] his statements and actions." Compl. ¶ 76. The next day, Secretary Hegseth posted again that "'Captain' Kelly['s] . . . sedition video intentionally undercut good order & discipline." Compl. ¶ 77 (quotation marks in original). Secretary Hegseth has thus "entrench[ed]" his view on Senator Kelly's conduct through "public[] state[ments]" and it is "difficult, if not impossible, for him to reach a different conclusion" now. *Cinderella*, 425 F.2d at 590.

Due process demands that Senator Kelly be given "not only . . . every element of fairness but . . . [also] the very appearance of complete fairness." *Id.* at 591. His retirement grade determination falls well short of that standard because its presiding officer has publicly, vehemently, and consistently "adjudged the facts as well as the law . . . in advance of hearing it." *Id.* at 590-91.

### E.    Defendants' Reopening Exceeds Their Statutory Authority

Defendants' reopening of Senator Kelly's retirement grade violates 10 U.S.C. § 1370 in two separate ways.

#### 1.    Section 1370 Forecloses Reopening Senator Kelly's Retirement Grade Based on Post-Retirement Conduct

First, the reopening rests on post-retirement conduct and is therefore unlawful per se. Under § 1370, an officer's retirement grade must be determined *exclusively* on the basis of active-duty conduct: Officers "shall be retired in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily," unless "an officer committed misconduct in a lower grade than the retirement grade otherwise provided for the officer by this section." 10 U.S.C. § 1370(a)(1), (3). No text in § 1370 authorizes the military to reduce an officer's retirement grade for post-retirement conduct. Rather, courts have recognized that, "subject to length of service requirements, the statute and regulation establish that a commissioned officer, other than a commissioned warrant officer, is entitled to be retired in the highest grade *in which he served on active duty satisfactorily*, as determined by the Secretary of the Army or his designee." *Spellissy v. United States*, 103 Fed. Cl. 274, 281-82 (2012) (emphasis added).

As a result, an officer's retirement grade is generally "final on the day the officer is retired." 10 U.S.C. § 1370(f)(1). Although § 1370 provides two exceptions to that finality, they can be triggered only by pre-retirement conduct and thus confirm the point: The military cannot consider post-retirement conduct when determining an officer's retirement grade under Section 1370.

One exception is that an officer may retire with a "conditional determination," *id.*, when he is "under investigation for alleged misconduct or pending the disposition of an adverse personnel action at the time of retirement," *id.* § 1370(d). By its terms, this exception is limited to pre-retirement conduct—the investigation or action must be ongoing "at the time of retirement."

Section 1370(f) also provides four circumstances under which a finality determination may be "reopened":

(A) If the retirement or retired grade of the officer was procured by fraud.

(B) If substantial evidence comes to light after the retirement that could have led to determination of a different retired grade under this section if known by competent authority at the time of retirement.

(C) If a mistake of law or calculation was made in the determination of the retired grade.

(D) If the applicable Secretary determines, pursuant to regulations prescribed by the Secretary of Defense, that good cause exists to reopen the determination of retired grade.

Each of these subparagraphs hinges on pre-retirement conduct. Subparagraphs (A) through (C) do so on their face. And coming on their heels, subsection (D) is best understood to carry that same limitation, particularly when every other aspect of § 1370 focuses on pre-retirement conduct. *See Maracich v. Spears*, 570 U.S. 48, 66-68 (2013) (defining the scope of an exception with reference to the "statutory design" and other, related exceptions); *see also Farrell v. Blinken*, 4 F.4th 124, 136 (D.C. Cir. 2021) (Courts "interpret statutes as a whole, not in convenient slices."). That reading of subsection (D) is reinforced by the fact that reopening a retired servicemember's grade for post-retirement conduct would be futile. Reopening the grade determination simply puts the original question back before the Secretary: His authority is limited to re-determining whether "such officer . . . served *on active duty* satisfactorily." *Id.* § 1370(a)(1) (emphasis added). It would make no sense to allow the Secretary to *reopen* that determination based on conduct post-dating "active duty" service, which could not possibly be relevant to the Secretary's assessment under the statute.

Defendants' actions concededly rest on post-retirement conduct. Secretary Hegseth's letter cites to a "pattern of public statements" taking place "[b]etween June 2025 and December 2025," Ltr. at 1—well over a decade after Senator Kelly retired. These statements are the only reason

29

given for Secretary Hegseth's "good cause" determination and his order to the Secretary of the Navy regarding Senator Kelly's retirement grade. Ltr. at 3. They are also the only conduct being considered in the new grade determination, as that determination is to be based on "the circumstances" and "factual basis" described in Secretary Hegseth's letter. Ex. B at 1. Section 1370 gives Defendants no authority to reopen Senator Kelly's grade determination or make a new one solely on the basis of post-retirement conduct.

The limitlessness of Defendants' position is alarming. They assert the perpetual authority to monitor the activities of retired servicemembers and to strip them of their grade and pension if Defendants deem anything objectionable. Section 1370 "is, however, 'a wafer-thin reed on which to rest such sweeping power." *Biden v. Nebraska*, 600 U.S. 477, 499 (2023) (citation omitted). And "common sense," *id.* at 512 (Barrett, J., concurring), tells us that when a statute is written to give the military authority to determine "the highest permanent grade in which such officer is determined to have served on active duty satisfactorily," 10 U.S.C. § 1370(a)(1), it means what it says. It cannot be wielded permanently as a sword of Damocles hanging over the heads of generations of Americans who answered the call, honorably served their country, and retired from active duty long ago.

Even if the text of § 1370 left doubts about its limits, reading the statute to allow reopening and reducing the grade of a sitting Member of Congress based on post-military-retirement speech would raise "serious doubts of constitutionality" on numerous grounds, and thus should be avoided. *Crowell v. Benson*, 285 U.S. 22, 62 (1932). First, because retirees' speech presumptively receives full First Amendment protection, *supra* section I.A.1, § 1370 should not be read to permit reopening and reduction of military grades based on post-retirement speech. Second, it is highly doubtful that Congress intended § 1370 to cover the speech of a sitting Member, which would raise

serious concerns under the Speech or Debate Clause. *Supra* section I.B. Third, "[o]ut of respect for the separation of powers and the unique constitutional position of" Members of Congress, § 1370's "textual silence is not enough to subject" a sitting Member to its provisions. *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992); *see supra* section I.C. The notion that Congress "intended" § 1370 to reach sitting Members is particularly weak because the Incompatibility Clause categorically forbids Members from simultaneously holding a military office. *Id.*; *see* U.S. Const. art. I, § 6, cl. 2. Finally, neither the Supreme Court nor the D.C. Circuit has settled whether Article I's "make Rules" Clause—the constitutional authority under which § 1370 was enacted— extends to retired servicemembers at all, let alone for post-retirement conduct. *Cf. Larrabee v. Del Toro*, 45 F.4th 81 (D.C. Cir. 2022) (holding that Congress could "make Rules" regarding members of the Fleet Marine Reserve). The "constitutional-avoidance principle" thus reinforces what § 1370 already makes clear: grade determinations depend on conduct of the servicemember while in active duty, not after retirement. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 775-76 (2025).

> 2.  *Section 1370 Does Not Permit the Secretary of Defense to Reopen the Grade Determination of a Navy Captain*

Independently, Defendants violated § 1370 because Secretary Hegseth, rather than the Secretary of the Navy, made the determination to reopen Senator Kelly's grade determination and reserved for himself the final decision over Senator Kelly's retirement grade. But the statute provides that the Secretary of the Navy—*not* the Secretary of Defense—"shall" make the "determination of satisfactory service" for officers "serving in a grade at or below the grade of major general or rear admiral." 10 U.S.C. § 1370(a)(2)(A). Section 1370 authorizes the Secretary of Defense to make satisfactory-service determinations *only* "if the officer is serving or has served in a grade above the grade of major general or rear admiral." *Id.* § 1370(a)(2)(B). Likewise, § 1370 authorizes only the "applicable Secretary" to make the determination that "good cause exists" for

reopening. *Id.* § 1370(f)(2)(D). Because Senator Kelly retired as a Captain—a grade "below the grade of major general or rear admiral"—any determination as to him must be made by the Secretary of the Navy, not the Secretary of Defense. Compl. ¶¶ 165-66.

### F.    Defendants' Actions Are Subject to Immediate Judicial Review

This court may immediately review Defendants' actions for three independent reasons.

#### 1.    Defendants' Actions Are Reviewable Final Agency Actions Under the Administrative Procedure Act

Both the censure letter and the attempted reopening of Senator Kelly's grade determination are final agency actions immediately reviewable under the Administrative Procedure Act (APA). The APA waives sovereign immunity and provides a cause of action to challenge "final agency action" on several grounds, including that it violates the Constitution or other federal laws. 5 U.S.C. § 704; *see id.* § 706(2). Agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations … from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).

The Secretary's censure letter plainly meets that test. The letter's determinations regarding Senator Kelly's speech are not of a "merely tentative or interlocutory nature." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). Rather, the letter contains Secretary Hegseth's conclusive determination to censure Senator Kelly and to declare his conduct as "prejudicial to good order and discipline in the armed forces" and "unbecoming an officer," Ltr. at 2. It "*will* be placed in [Senator Kelly's] official military personnel file." Ltr. at 3 (emphasis added). And while it gives Senator Kelly a right to file a responsive letter, it states expressly that he has no "right to appeal." Ltr. at 3. It is therefore a "final and binding determination." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (citation omitted).

The censure letter action also triggers "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178). Once "placed in [Senator Kelly's] official military personnel file," Ltr. at 3, the letter may be used in "any . . . administrative action on the part of the service concerned," U.S. Dep't of Navy, JAGINST 5800.7G CH-2, *Manual of the Judge Advocate General*, sec. 0114A(b) (Dec. 1, 2023) (describing censures from the Secretary of the Navy). And it will be. Defendants' notice reopening Senator Kelly's grade states that "[t]he factual basis supporting [the grade determination] is . . . [the] letter of censure." Ex. B at 1. The Secretary of the Navy "will review the circumstances" of that censure and "make a recommendation" based on it. *Id*.

The censure letter thus has the immediate effect of placing Senator Kelly's retirement grade and pay in jeopardy. That makes it final, even if further proceedings might be needed to actually change his grade and pay. The Supreme Court has made clear that, when a final agency action triggers further proceedings that threaten "serious criminal and civil penalties," "parties need not await enforcement proceedings before challenging [the] final agency action." *Hawkes*, 578 U.S. at 600 (citation omitted). In other words, even if an agency action "would have effect only if and when a particular action was brought" to implement it, that action still is final if it "warns" parties that their conduct places them "at risk." *Id.* at 599-600. An agency cannot, by contrast, "strong-arm[] … regulated parties into 'voluntary compliance' without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the [agency's] jurisdiction." *Sackett v. EPA*, 566 U.S. 120, 130-31 (2012).

Here, the case for finality is even stronger. Far from a mere warning, the censure itself carries significant reputational and military-related consequences *and* serves as the factual predicate for additional, consequential proceedings to alter Senator Kelly's grade and pay. The

letter thus "makes [Senator Kelly] eligible for … penalties," rendering it final. *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016).

In addition, the censure letter has immediate "legal consequences" for Senator Kelly's rights under the First Amendment and the Speech or Debate Clause—namely, it restricts and expressly attempts to chill them. *Bennett*, 520 U.S. at 178. The Secretary threatens to "criminal[ly] prosecut[e]" Senator Kelly or take "further administrative action" against him if the Senator continues to engage in protected speech. Ltr. at 3. Defendants' decision to "proscrib[e]" and make "credible threat[s] of prosecution" based on Senator Kelly's protected speech entitles the Senator to sue now, because he need not "expose himself to liability before bringing suit to challenge the basis for the threat." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007)).

Second and independently, Defendants' attempted reopening of Senator Kelly's retirement grade determination is its own final agency action. Retirement grade decisions are "final on the day the officer is retired." 10 U.S.C. § 1370(f)(1). Federal law grants the Secretary of the Navy the authority to "reopen[]" a "final determination of the retired grade of an officer" only in narrow circumstances. *Id.* § 1370(f)(2). The Secretary has determined that those circumstances exist; as a result, Senator Kelly's grade determination is reopened and his "retirement paygrade will be revisited." Ex. B at 1. Even if Senator Kelly endures the administrative process to retain his retired grade, there is nothing tentative about the *reopening*: "on that question," the Secretary's decision is "definitive." *Hawkes Co.*, 578 U.S. at 597-98. Just as in cases where courts have found agencies' initial "jurisdictional determinations" to be final agency actions—notwithstanding potential future proceedings—the "possibility" that the agency could "revise" its decision "based on new

information . . . does not make an otherwise definitive decision nonfinal." *Id.* at 598 (citing *Sackett*, 566 U.S. at 130-31).

Moreover, "legal consequences will flow" immediately from the reopening. *Bennett*, 520 U.S. at 178. Reopening itself carries legal significance: without it, § 1370 forbids changing his grade and, with it, the statute (in Defendants' view) allows it. And the reopening decision purports to regulate Senator Kelly's protected speech and legislative activity just as the censure does. *See, e.g.*, *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 485-86 (1975) (court decision "final" in part because "[d]elaying final decision of the First Amendment claim . . . could only further harm the operation of a free press").

Nor is exhaustion of the agency proceeding a prerequisite to judicial review of either the censure or reopening decisions. The APA imposes no exhaustion requirement, instead requiring only that the plaintiff identify a final agency action. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993). Thus, in APA cases, "an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Id.* There are no such statutory or regulatory review procedures here; the censure and reopening decisions both are effective immediately, with the censure expressly stating that no appeal is available. Ltr. at 3. Exhaustion doctrines are inapplicable.

Regardless, courts do not require parties to exhaust administrative remedies "where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992). Senator Kelly nominally has the opportunity to "submit a statement" in his defense to the Secretary of the Navy, Ex. B at 1, and the Secretary of the Navy will then make a "recommendation" to Secretary Hegseth regarding "whether a reduction

in grade is appropriate." Ltr. at 3. But that process in this instance is a charade. Navy regulation lists "[e]xamples" of conduct triggering "retirement in a lesser grade," including "abuse of special position," "an act which brings discredit upon the armed services," and "an act . . . that adversely affects the ability of the military . . . to maintain discipline[ and] good order." U.S. Dep't of Navy, Sec'y of Navy Instr. 1920.6D, Enclosure 9, 2(a) (July 24, 2019) (providing guidance for Board of Inquiry recommendations). Secretary Hegseth has *already* stated his final determination that Senator Kelly's conduct matches each of those examples. *See* Ltr. at 2 (stating Secretary Hegseth's "determination" that Senator Kelly abused "a current position of authority," brought "discredit upon the armed forces," and "directly prejudice[d]" the military's "good order and discipline"). "[R]equiring administrative review through a process culminating with" the very same decisionmaker "would be to demand a futile act." *McCarthy*, 503 U.S. at 148 (quoting *Houghton v. Shafer*, 392 U.S. 639, 640 (1968)).

Finally, it cannot be doubted that the Department of Defense and the Department of the Navy are "agencies" subject to review under the APA. The Act "codifie[s]" the elemental presumption in American law that "one who has been injured by agency action is presumptively entitled to judicial review." *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979). Keeping with that tradition, it defines "agency" broadly to include "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 701(b)(1). It contains no carve-out for military orders. Indeed, when Congress wanted the military's orders to be beyond APA review it expressly said so, removing from the definition of agency "courts martial and military commissions," and "military authority exercised in the field in time of war or in occupied territory." *Id.* at § 701(b)(1)(F), (G). These exceptions prove the rule that "agency" under the APA applies to all "other military functions." *Roelofs v. Sec'y of Air Force*,

628 F.2d 594, 599 (D.C. Cir. 1980) (reviewing discharge orders); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513-15 (D.C. Cir. 1989) (APA challenge to Board decision regarding denied promotion); *Code v. McCarthy*, 959 F.3d 406, 408, 415 (D.C. Cir. 2020) (APA challenge to Board refusal to expunge record); *Jackson v. Mabus*, 808 F.3d 933, 935-36 (D.C. Cir. 2015) (similar).

### 2.    The Court Can Immediately Review Defendants' Authority to Proceed

In addition to the APA, the Supreme Court has recognized that plaintiffs involved in enforcement actions by federal agencies have a freestanding right to "challenge the constitutional authority of [an] agency to proceed." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 195-96 (2023). Because *any* proceedings against Senator Kelly by Defendants violate the First Amendment, the Speech or Debate Clause, the separation of powers, and due process, this court has jurisdiction to review Defendants' unconstitutional actions immediately.

Although federal courts often defer judicial review of agency actions until all agency proceedings have run their course, the Supreme Court has recognized that some claims are exempt from these requirements. *See id.* at 185-86. Three factors guide this analysis: (1) whether "precluding district court jurisdiction" over an immediate lawsuit would "foreclose all meaningful judicial review of the claim," (2) whether the claim is "wholly collateral to [the agency's] statut[ory] review provisions," and (3) whether "the claim [is] outside the agency's expertise." *Id.* at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994)). The Court in *Axon* explained that judicial review might be appropriate even "if the factors point in different directions," and that "[t]he ultimate question is how best to understand what the Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

*Axon* itself is highly instructive. The challengers there were involved in enforcement actions brought before administrative law judges (ALJs) under the Exchange Act and FTC Act,

which "both provide for review of a final Commission decision in a court of appeals." *Id.* at 181. But rather than awaiting review using those prescribed routes, the challengers "sued in district court prior to an ALJ decision, seeking to enjoin the Commission's proceeding." *Id.* at 182. The Court applied the *Thunder Basin* factors to hold that this avenue for immediate district-court review was available. *See id.* at 188-89. First, the challengers' asserted injury of "being subjected to . . . unconstitutional agency authority" was a "here-and-now injury" that "is impossible to remedy once the proceeding is over." *Id.* at 191 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). The court drew an analogy to judicial review under "established immunity doctrines," where "rights are 'effectively lost' if review is deferred until after trial." *Id.* at 192-93 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985))*.* Second, the Court explained that the challenge to "the Commissions' power to proceed at all," rather than "how that power was wielded," were "collateral" to the "subject of the enforcement actions." *Id.* at 193. Finally, the parties' structural claims were "outside the [Commissions'] expertise": they "raise[d] 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* at 194 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010)).

The same is true here. Senator Kelly challenges the agency's authority to proceed root and branch—including, just as in *Axon*, as a "violation of separation-of-powers principles." 598 U.S. at 180. He asserts that the Executive's actions are entirely predicated on protected speech; that its actions violate the separation of powers *per se*; that it has taken action based on shielded legislative activity and protected speech; that its decision has been irredeemably predetermined; and that it has no statutory authority to proceed against him. As to Speech or Debate Clause immunity in particular, that immunity, like those referenced in *Axon*, is "effectively lost if review is deferred," *id.* at 190 (citation omitted), because the Clause shields Members "not only from the consequences

of litigation's results but also from the burden of defending themselves." *Hutchinson*, 443 U.S. at 123 (citation omitted).

By virtue of these constitutional and statutory violations, the grade determination proceeding itself—not merely its outcome—causes injury. Moreover, as in *Axon*, that "here-and-now" harm—subjection to "unconstitutional agency authority"—cannot be cured once the reopening process has run its course. 598 U.S. at 190. The challenge is also collateral to the agency's own proceedings: Senator Kelly, like the *Axon* litigants, presently contests not the factual allegations or prospective grade determination (though he will do that too if need be), but rather the Executive's structural ability to proceed at all. *Id.* at 193. And the issues he raises—from the First Amendment to the absolute protections of legislative immunity—are fundamental, structural questions that lie outside the agency's "competence and expertise." *Id.* at 194. District court jurisdiction is therefore proper now, regardless of any internal procedures the Executive purports to invoke.

3.    *The Threats of Future Enforcement Action Alone Warrant Immediate Intervention*

Finally, in addition to APA and *Axon* review, immediate review is available because the Secretary's letter explicitly threatens "criminal prosecution or further administrative action" based on Senator Kelly's constitutionally protected conduct. Ltr. at 3. The Supreme Court has long made clear that immediate judicial intervention—before "an actual arrest, prosecution, or other enforcement action"—is available when a government actor has "proscribe[d]" a party's conduct and made "a credible threat of [future] enforcement." *Susan B. Anthony List*, 573 U.S. at 158-59 (citing *Steffel v. Thompson,* 415 U.S. 452, 459 (1974)). This principle justifies judicial review of Defendants' actions now, without the need "to await and undergo" punishment first. *Id.* at 161 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010)).

*Susan B. Anthony List* is controlling. There, the Ohio Elections Commission received complaints against an advocacy organization asserting that the organization violated the state's false-statements law. *Id.* at 153-54. The organization sued to challenge the law, alleging that it "intend[ed] to engage in substantially similar activity in the future," and that it "faced the prospect of its speech and associational rights again being chilled and burdened, because any complainant can hale it before the Commission, forcing it to expend time and resources defending itself." *Id.* at 155 (cleaned up). The Supreme Court held that the organization had standing and that its constitutional challenge was ripe. *Id.* at 168. The Court canvassed its prior decisions allowing "preenforcement challenge[s]" to state and federal laws based on "threatened enforcement." *Id.* at 158-61. Among them was *Steffel*, in which a protester secured a declaratory judgment against a trespass statute as applied to his handbilling because he had previously "been warned to stop handbilling," he "stated his desire to continue handbilling," and prosecution of another similarly situated protester "showed that his 'concern with arrest' was not 'chimerical.'" *Id.* at 159 (quoting *Steffel*, 415 U.S. at 459).

The case for immediate relief here is no different. Senator Kelly faces unconstitutional punishment based on his protected speech. *Supra* section I.A. He has made clear that he intends to continue speaking on these issues in the future as part of his legislative duties, oversight responsibilities, and public advocacy. Compl. ¶¶ 116-18. And Defendants' letter expressly states that this category of speech is, in their view, prohibited and punishable—through censure, through the reopening of his grade determination, and through future "criminal prosecution or further administrative action." Ltr. at 3.

The threat of enforcement here is, if anything, more concrete than in *Susan B. Anthony List*. There, the Court emphasized that standing existed even though the prior complaint had been

withdrawn and no enforcement proceeding was ongoing. 573 U.S. at 164-65. What mattered was the combination of past enforcement activity, the plaintiff's stated intent to engage in similar conduct, and the realistic prospect that the challenged regime would again be used to target that conduct. *Id.* at 161-64. Here, by contrast, Senator Kelly has already been censured for his constitutionally protected speech, and is subject to ongoing proceedings threatening further punishment; he has every reason—indeed, a constitutional obligation—to continue speaking on the same subjects; and Defendants retain both the authority and the expressed inclination to pursue punitive action in response. Immediate judicial review is necessary to prevent further constitutional harm.

## II.    Senator Kelly Will Suffer Irreparable Harm Absent Injunctive Relief

To start, the nature of the constitutional injuries here alone requires an immediate injunction. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (similar); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] violation of Fifth Amendment due process rights . . . support[s] injunctive relief."). These injuries are irreparable "because [they] cannot be fully compensated by later damages." *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F. Supp. 218, 224 (D.D.C. 1990) (collecting cases).

Specifically, the D.C. Circuit has made clear that "retaliation against [plaintiffs] in response to their exercise of their First Amendment rights" is "an irreparable injury." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). "By establishing a likelihood of success on the merits of [his] First Amendment claims," Senator Kelly "has established [he] will suffer irreparable harm in the absence of preliminary relief." *Am. Bar Ass'n v. DOJ*, 783 F. Supp. 3d 236,

247 (D.D.C. 2025). Similarly, the violation of Senator Kelly's procedural due process rights creates an ongoing irreparable harm. *See, e.g.*, *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012).

Infringement on legislative acts protected by the Speech or Debate Clause—and related principles of immunity for official acts—also causes irreparable injury. Rights under "established immunity doctrines" like legislative immunity are "effectively lost if review is deferred." *Axon*, 598 U.S. at 192 (citation omitted). That is why orders denying protection under these immunities are always immediately appealable under the collateral order doctrine. *See In re Sealed Case*, 80 F.4th at 361. And courts have specifically held that infringement of the interests that the Clause protects causes irreparable harm. *Jewish War Veterans of U.S., Inc. v. Gates*, 522 F. Supp. 2d 73, 81 (D.D.C. 2007).

Likewise, the separation-of-powers injury demands immediate intervention. Unlike cases that involve questions of interbranch authority with incidental effects on regulated parties, *see, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1334 (D.C. Cir. 2024), the claim here is one of *direct* interbranch intrusion. As explained, the Executive's actions are an assault not just on the separation of powers in the abstract, but on Senator Kelly's ability to perform his constitutional functions as an elected representative. Allowing this action to proceed is causing ongoing, irreparable harm to those constitutional functions, which cannot possibly be remedied after the fact. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (brackets removed) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).

Finally, Defendants' actions are causing ongoing and irreparable reputational harm. The D.C. Circuit has held that reputational damage is irreparable where official action "could not fail to damage" a plaintiff's "good name." *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962). Courts likewise find irreparable harm where an official determination portrays a person or entity as engaging in wrongdoing and thereby leaves a lasting "black mark" on reputation. *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *see Xiaomi Corp. v. U.S. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9-10 (D.D.C. Mar. 12, 2021) (collecting cases). Defendants' actions amply meet these standards. The whole point of placing a letter of censure in a servicemember's file is to denigrate that servicemember's record and reputation. And this is no ordinary censure. It was preceded by repeated, inflammatory public statements prejudging the conclusion before any formal action was taken. The Secretary then declared, formally, that Senator Kelly "had engaged in conduct that seriously compromises [his] standing as an officer and brings dishonor to the officer corps," including by supposedly "counsel[ing] members of the armed forces to refuse lawful orders." Ltr. at 2. The looming proceeding to strip his rank and status based on those same findings only compounds that harm.

## III.    The Balance of Equities and Public Interest Weigh Heavily in Senator Kelly's Favor

The balance of equities and public interest strongly favor Senator Kelly—not the Executive Branch that is attempting to punish and chill protected speech and legislative activity. "[T]here is always a strong public interest in the exercise of free speech rights." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The public interest is especially strong where, as here, the Executive's speech-based retaliation threatens to chill core political speech by deterring others from participating in ongoing public debate. *See Media Matters for Am.*, 138 F.4th at 582, 585.

There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v.*

*Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (holding that when an agency failed to adhere to a statute's standards, the "public interest balance plainly would weigh in favor of an injunction"). As demonstrated above, Defendants' actions are both unconstitutional and in excess of the agency's statutory authority.

On the other side of the ledger, no cognizable harm—let alone one that outweighs the constitutional injuries at stake—will arise from halting the Department's unlawful actions while this litigation proceeds. The only "harm" Defendants could plausibly identify is its baseless assertion that Senator Kelly's speech is having effects the Department disfavors—an interest the First Amendment and Speech or Debate Clause categorically foreclose. Preventing unprecedented and politically motivated retaliation against a sitting U.S. Senator for his political speech does not merely avert irreparable injury to Senator Kelly. It also assures military retirees that they need not surrender their First Amendment rights to preserve their service records and pensions, maintains the broader public's confidence in the coequal structure of American government, and ensures the public that military authorities will not be wielded as instruments of partisan reprisal.

## CONCLUSION

For the foregoing reasons, the Court should grant Senator Kelly's motion, enjoin and stay the effect of Defendants' actions pending further review, and enjoin Defendants from initiating or furthering any enforcement proceeding against Senator Kelly.

Dated: January 12, 2026    Respectfully submitted,

By:  */s/ Paul J. Fishman*
   Paul J. Fishman (DC Bar No. 449014)
   ARNOLD & PORTER KAYE SCHOLER LLP
   One Gateway Center
   Suite 1025
   Newark, NJ 07102
   (973) 776–1900
   paul.fishman@arnoldporter.com

   Benjamin C. Mizer (DC Bar No. 204906)
    (*pro hac vice* forthcoming)
   Deborah A. Curtis (DC Bar No. 451716)
   Jeffrey H. Smith (DC Bar No. 419-521)
   Samuel F. Callahan (DC Bar No. 888314461)
   Bonnie E. Devany (*pro hac vice* forthcoming)[*]
   Aaron X. Sobel (DC Bar No. 90018659)
    (*pro hac vice* forthcoming)
   ARNOLD & PORTER KAYE SCHOLER LLP
   601 Massachusetts Avenue, NW
   Washington, DC 20001
   (202) 942–5000
   benjamin.mizer@arnoldporter.com
   deborah.curtis@arnoldporter.com
   jeffrey.smith@arnoldporter.com
   sam.callahan@arnoldporter.com
   bonnie.devany@arnoldporter.com
   aaron.sobel@arnoldporter.com

---

[*] *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*